UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL WINDHAM, JR., | Case No. 2:18-cv-02656-WBS-DMC-P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATION |
| C. WOFFARD, et al., | |
| Defendants. | |

      Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court is Defendants' motion for summary judgment, ECF No. 38, Plaintiff's opposition briefs, ECF Nos. 40, 41 & 42, and Defendants' reply, ECF No. 47. Plaintiff alleges that each Defendant was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

      Defendants argue they are entitled to summary judgment because there is no evidence that they were deliberately indifferent to Plaintiff's serious medical needs and they are entitled to qualified immunity. ECF No. 38. The undersigned finds that there is no genuine dispute about whether Defendants' violated Plaintiff's Eighth Amendment rights and thus recommends that Defendants' motion for summary judgment be granted.

/././

## I. BACKGROUND

Plaintiff was involved in an explosion in 1980, which left him with burns on over 75% of his body. ECF No. 38-3 at 68. He has had multiple skin graft procedures over the years, with the most recent occurring in 2013. ECF No. 41 at 60. This procedure was performed by Dr. Scott Hansen, a plastic surgeon at the University of California at San Francisco Medical Center ("UCSF"). Id. While it was initially successful, the skin graft ultimately failed, leaving Plaintiff with exposed wounds. ECF No. 38-3 at 67. Dr. Hansen suggested in Plaintiff's medical record that the skin graft failed because of self-inflicting sabotage. Id. Dr. Hansen also noted that the skin graft used during that procedure was the only remaining donor site, ECF No. 41 at 61, and that he did not recommend any further intervention besides wound care, ECF No. 38-3 at 67.

In October of 2017, Plaintiff arrived at California Medical Facility ("CMF"). Id. at 17. While there, Plaintiff was treated by several physicians and nurses. Specifically, he saw numerous plastic surgeons, and each indicated that surgical intervention was not a viable option for Plaintiff and recommended aggressive wound care. Id. at 130.

Plaintiff's allegations stem from the treatment he received at CMF during 2017 and 2018. In the second amended complaint, he names six defendants: associate prison wardens, C. Woffard and J. Medina, medical doctors U. Pai and M. Osman, and registered nurses R. Champion and C. Inniss-Burton. ECF No. 23. He alleges six separate claims of deliberate indifference to his serious medical needs, which the undersigned describes below.

Plaintiff alleges that C. Woffard, the associate warden at CMF, denied him access to a hydrotherapy bathtub that was order by Dr. Sawicki and a follow-up visit with a plastic surgeon. Id.

Defendants U. Pai and M. Osman were physicians who treated Plaintiff while he was at CMF and he alleges that they did not provide him with adequate medical care. Id. at 12-14. Plaintiff claims specifically that Defendants Pai and Osman failed to provide treatment ordered by another physician and denied him access to off-site specialists. Id. He also alleges that Defendant Pai sent him to a doctor who proscribed "damaging treatment that worsened [his] skin graft." Id. at 12.

Defendant R. Champion and C. Inniss-Burton were registered nurses who treated Plaintiff from February 2018 to October 2018. Id. at 16-18. He claims Defendants Champion and Inniss-Burton used a type of bandage that damaged his wound and failed to comply with orders from Plaintiff's specialist. Id. He also claims that Defendant Champion falsified his medical records by showing that he had used a bathtub when he states the bathtub has been inoperable since 2016. Id. at 16.

Plaintiff alleges that Defendant J. Medina, who is an associate warden at CMF, kept him in a cell that had a leaking ceiling which caused a MRSA infection. Id.

## II. THE PARTIES' EVIDENCE

### A. Defendants' Evidence

Defendants' motion for summary judgment is supported by several exhibits and a Statement of Undisputed Facts, ECF No. 38-3, contending the following facts are undisputed:

> 1. Plaintiff Samuel Windham, Jr. (D06689) is a state prisoner currently housed at the California Medical Facility (CMF) in Vacaville, California, the institution where the alleged Eighth Amendment violations occurred. (Defendants' Exhibit A (DX A), decl. of H. Morris and documents from Plaintiff's central file, p. 1-3.)
>
> 2. Defendants are all employees of the California Department of Corrections and Rehabilitation (CDCR), and at all times relevant to the matters at issue worked at CMF in the following positions: Defendants Snelling and Medina were Associate Wardens; Defendants Pai and Osman are Physicians and Surgeons who acted as Plaintiff's Primary Care Physicians (PCP); and Defendants Champion and Innis-Burton were Registered Nurses (RN). (ECF No. 23, Second Amended Complaint, at pp. 5-6.)
>
> 3. Windham has burn scar injuries to his abdomen, both thighs, and both of his lower legs. (Defendant's Exhibit B (DX B) decl. of H. Morris and documents from Windham's medical file (DX B, pp. 29-182.).)
>
> 4. On May 8, 2013, Windham was admitted to the University of California at San Francisco (UCSF) Medical Center for a skin graft operation. (DX B, pp. 1-11.) Plastic surgeon Scott L. Hansen, M.D. removed skin from a donor site on Windham's abdomen and grafted it onto a wound on Plaintiff's right thigh. (DX B, p. 2.)

///

///

5. Following surgery, Windham was kept at UCSF for 13 days to ensure the graft had taken, and then was discharged from UCSF Medical Center on May 21, 2013 with "100% take" on his skin graft; his medical records state: "Condition at discharge: good." (DX B, pp. 1-11.)

6. After returning to CMF, Windham was temporarily housed on G-2, the "acute care" hospital wing, pending the availability of his prior housing at the Outpatient Housing Unit (OHU) in the G-3 wing at CMF. (DX B, p. 14-16.)

7. Plaintiff's CDCR Admissions records to the acute care wing on May 21, 2013 included a Physician's Order by Dr. Mo, which stated, "Wound care: keep dry. Apply Bacitracinoint., Teflon [sic] & Kerlex dressing twice a day." (DX B, p. 13.)

8. On May 23, 2013, at 0100, the records indicate that Windham was "in no distress;" there was "no discomfort noted." (DX B, p. 17-18.)

9. Registered Nurse (RN) Yun changed Windham's dressings on May 23, 2013, and observed the wounds on Windham's legs were clean and healthy. (DX B, p. 16.)

10. At 0915 on May 23, 2013, the covering clinician, Usha Pai, M.D., found Windham lying in bed with his right thigh skin graft wound uncovered and the Kerlix dressings were around his knees. (DX B, p. 17-18.) Although his dressing had been changed just forty minutes earlier, Windham told Dr. Pai that he was awaiting a dressing change. (DX B, p. 17.)

11. Dr. Pai advised Windham to not meddle with dressings and to leave the graft area covered until the dressings were changed by the nursing staff. (DX B, p. 17.)

12. At 1600 on May 23, 2013 Windham's chart noted than his "recent skin grafts" were "healing well." Windham told the attending nurse, "Yeah it [the skin graft] went so well I'm ready to get the rest of the grafts done." (DX B, p. 20.) He was awake, alert and in no particular distress. The nurse performed a dressing change, and administered routine medications. His records indicate: "Patient making good progress." (Id.)

13. After an encounter with Windham at 1820 on May 24, 2013, Dr. Mo recorded, "No issues with the new graft." (DX B, p. 18.)

14. On May 25, 2013, Windham told RN Yun, "I am OK," meaning he was not in pain. (DX B, p. 23.) There were no signs of infection. She noted in the chart, "Inmate/ patient is comfortable with his regime," meaning that Windham was comfortable with the routine medication. (Id.)

15. At 1120 on May 25, 2013, Windham refused to allow RN Yun to change his dressings. (DX B, p. 23.)

16. Windham later refused a dressing change by RN Cortez, saying, "I don't want that antibiotic ointment substitute." (DX B, p. 25.)

4

17. On May 25, 2013, an unidentified nurse removed Windham's right thigh dressing "per dressing orders." (DX B, p. 23.)

18. The "Primary Care Provider Progress Note" authored by D. Mehta, M.D. on May 25, 2013 recorded that, at 1330, Windham "complains of opening of skin graft on R thigh since yesterday. No F/discharge/N." (DX B, p. 26.)

19. On May 26, 2013 at 1350 Dr. Mo recorded in his Interdisciplinary Progress Notes, "R thigh graft–mostly broken down, "raw" granulation tissue over anterior half. There is dark, appearing tissue over the posterior 1/3 to 1/2 with a geographic, spotty appearance. Doesn't appear viable. . . . This [graft] doesn't appear to have taken. Pt. upset over lack of Bacitracin here (per pharmacy there is none) and c/o incorrect dressing change. However, I don't know if that would have made much difference. Will change with Vaseline for now. Pt. to f/u at UCSF." (DX B, p. 27.)

20. Windham returned to Dr. Hansen at UCSF for a follow-up visit on June 6, 2013. Dr. Hansen observed, "It is unclear to me how a graft which had 100% take now would be gone. He blames the wound care in his facility but he really didn't need wound care on this area given his healing. I did speak with the Prison MD and expressed my concern that this could be self-inflicted. At this point I will not plan any further intervention as everything to date has failed." (DX B, p. 28.)

21. Prior to his transfer to CMF, Windham was housed at the California Substance Abuse Treatment Facility (CSATF), arriving on September 8, 2017. (DX A, p. 1.)

22. Windham was housed in the Correctional Treatment Center (CTC) for wound care (DX B, p. 29), where Dr. Kokor noted that Windham did not want to speak with her, but rather, wanted to return to see Dr. Hansen. (DX B, p. 29.) Dr. Hashemi noted on September 16, 2017, that Windham was refusing all medical care, including wound care, dressing changes, medication, and having his vital signs taken. (DX B, p. 32.) When Dr. Hashemi attempted to speak with him, Windham turned his back and refused all communication. (Id.)

23. Windham was seen by Dr. Hansen on September 18, 2017. Dr. Hansen recommended aggressive wound care and a follow-up in six weeks. (DX B, p.34.)

24. On September 19, 2017, Nurse Practitioner (NP) Hales noted that Windham refused to engage with her except to state that he wanted to see Dr. Hansen at UCSF. (DX B, p. 34.) Hales contacted Dr. Hansen's front office for specific wound care instructions. (DX B, p. 34.)

25. On September 30, Windham advised Dr. Metts that he did not want to see him, but rather, to be seen by Dr. Hanson, the plastic surgeon at UCSF, and to be transferred to CMF. (DX B, p. 37.) Dr. Metts noted that since arriving at CSATF, Windham refused to allow medical staff to take his vital signs, clean his wounds, or change his dressings. (DX B, p. 37.) Windham also refused to allow medical staff into his room to clean it, although it needed to be cleaned. (DX B, p. 37.) Dr. Metts

5

noted that Plaintiff had been seen by Dr. Hansen, who recommended aggressive wound care, and that Windham be transferred to CMF. (DX B, p. 37-40.) Dr. Hansen wanted to see Windham again in three to five months. (Id.) Dr. Metts' assessment plan was to change Plaintiff's dressings as indicated by Dr. Hansen, and have Windham moved to general population so he could be transferred to CMF. (Id.)

26. On October 3, Nurse Practitioner Hales noted that Windham refused a physical examination. (DX B, p. 40.) When asked if his wounds were infected, Windham indicated that they were not. (Id.) Windham was refusing to allow nurses to administer wound care, preferring to do it himself. (Id.) Hales noted that Windham's cell was unkempt, with trash on the floor, bloody and dirty bed sheets, and bloody and body fluid-soaked chunks on Windham's wheelchair seat. (Id.) She advised Windham that they were working to effectuate his transfer to another prison. (DX B, p. 40.)

27. On October 6, 2017, Windham was scheduled to see Dr. Kokor, but indicated he did not want to see her, he wanted to see Dr. Hansen at UCSF. (DX B, p. 42-43.)

28. Nurse Practitioner Hales noted on October 10, 2017 that Windham refused to see any medical staff. (DX B, p. 40-41.) Hales also noted the condition of Plaintiff's cell, with food particles and trash all over the floor and walls. (Id.)

29. Windham was transferred to CMF on October 12, 2017. (DX A, p. 1.) D. Windham's medical care at CMF.

30. Windham arrived at CMF on October 12, 2017, and was examined by NP Ramirez who noted Windham's lower extremity burn wounds. (DX B, p. 45.) Windham again claimed that he was receiving wound care from Dr. Hansen at UCSF. (Id.) According to Windham, because of recent transfers, he had not been able to obtain adequate wound care. (Id.) Windham requested methadone for pain caused by his burn wounds, but NP Ramirez noted that he was receiving acetaminophen for pain, as narcotics were contraindicated with his history of substance abuse. (DX B, p. 45.)

31. Dr. Osman examined Windham on October 19, 2017, and found bilateral lower extremity decreased range of motion that Windham attributed to spina bifida history. (DX B, p. 46-47.) There were multiple eschars (scabs) with active ulceration noted over both lower legs worse on the left and right, also ulceration noted over left inner thigh. (DX B, p. 47.) Windham had some generalized weakness in his lower legs, but was able to move it while laying down, but claimed to be unable to bear weight. (DX B, p. 47.) He also noted Windham's was getting dressing changes twice a day, cleansed with saline and a Silvadene dressing. Windham had no fever or chills, however, Windham reported intermittent bleeding from the wound when he got up and walked around. (Id.) Dr. Osman recommended continued aggressive wound care. (Id.)

///

///

32. Dr. Osman saw Plaintiff again on October 26, 2017. (DX B, p. 51-52.) Windham complained about not seeing his plastic surgeon yet. (Id.) Dr. Osman noted that Windham was scheduled to be seen by the plastic surgeon the following week. (Id.)

33. On November 2, 2017, Dr. Osman noted that Windham had been taken to see an outside plastic surgeon the day before, but "when he realized that he wasn't going to UCSF patient declined to be seen and was brought back to CMF without seeing the plastic surgeon. Patient stated he did not want to see anybody but UCSF plastic surgeon Dr. Hansen. (DX B, p. 53-54.)

34. Windham was seen by Dr. Osman again on November 9, 2017. (DX B, p. 57-59.) Osman noted "I discussed with him that CDCR decides where a patient goes depending on contracts they got. And that's the doctor that is contracted with at this point for plastic surgery. I also told him if he wanted to see his plastic surgery that he has seen before at UCSF he can do it out of his own pocket. At this point he decided to except to go about for consultation with the plastic surgeon we contract with. Within a week he was scheduled again however due to traffic concerns he wasn't able to make it and patient was brought back again. I saw him this morning in his cell while the nurse was changing his dressing. The wound appears to be doing pretty good with some granulation tissue however it tends to bleed due to frequent dressing changes. I advised to have the area cleansed with saline and apply antibiotic, clean and some Vaseline applying nonstick dressing and leave it in for 3 days rather than doing it every day due to irritated tissue that's healing. However at this point patient got agitated and stated he does not want to do dressing changes every 3 days but rather do it every day, he doesn't care if it heals are not as he is more interested in seeing the plastic surgeon rather than concentrating on his wound healing. The wound appears to be superficial skin and doesn't appear to be deep ulceration. With a good dressing changes it is coaxially heal. However patient doesn't seem to be interested in the wound healing." (DX B, p. 57.)

35. Dr. Osman saw Windham again on November 16, 2017, and noted that there were two appointments with the plastic surgeon that had to be cancelled, and the plastic surgeon no longer wished to see Windham. (DX B, p. 59-60.) Dr. Osman noted that "patient is also difficult because he doesn't follow recommendations and instructions. I have now consulted one specialist with CDCR who is going to see the patient in telemedicine and give us further evaluation terms of his expertise regarding this wound which in my opinion can heal with secondary intention and wound care rather than surgical intervention. (DX B, p. 59.)

36. Windham refused to be examined by Dr. Osman at his next weekly appointment. (DX B, p. 62.)

37. On December 14, 2017, Windham was referred to wound care specialist, Dr. Mehta. (DX B, p. 65-69.) Dr. Mehta had treated Windham approximately six month earlier, and indicated that Windham was "hard to convince" about the optimal plan of care," but with continued hands-on treatment of wound care and compression therapy, Windham's wounds began to significantly improve. (Id.) In Dr. Mehta's

medical opinion, and based upon Windham's history of multiple skin grafts and recurrent wounds over many years, as well as a sedentary lifestyle due to his morbid obesity with long hours spent with his legs dangling, the underlying problem was lower extremity edema due to chronic venous insufficiency which is complicating his wound healing. Dr. Mehta believed that there was also likely an element of friction breakdown of Windham's skin during wheelchair transfers but the same is again complicated by under-perfusion of the skin surface from the arterial supply due to the intervening edema, minimizing his chances of spontaneous healing.  These issues were adequately addressed with some difficulty when Windham was housed at the California Health Care Facility, but Windham ruled out that same treatment plan when seen by Dr. Mehta on that date.  Windham refused to allow Dr. Mehta to examine him under any circumstance.  Dr. Mehta spent approximately 20 minutes explaining the pathophysiologic causes of Windham's wounds not healing, and that Mehta's recommendations conformed to the plastic surgeon's recommendation for a trial of aggressive wound care before surgical intervention.  Dr. Mehta warned Windham about the consequences of refusing to comply with the recommendations.  (Id.)

38.   On December 14, 2017, Dr. Pai referred Windham for an outside consultation with a plastic surgeon.  (DX B, p. 70.)  She renewed the referral on January 2, 2018.  (Id.)

39.   Windham had a follow-up appointment with Dr. Mehta set for January 10, 2018, but Windham refused to be seen.  (DX B, p. 73-74.)  Windham, did however, agree to come to the wound care clinic.  (Id.)  Dr. Mehta noted that nursing staff were concerned about the change in appearance in Windham's wounds before and after his showers, and of the possibility that Windham was manipulating his wounds.  "Patient remains extremely aggressive and loud in his communication with extensive use of abusive language.  'That shit ain't working'; 'Are you crazy?'; requiring repetitive requests and re-direction to establish the purpose/goals of this visit.  Dr. Mehta's reviewed Windham's chart for any intervening medical history, PCP notes, any recent specialist visits notes, RN wound care documentation, any recent lab/imaging studies and recent wound pictures (if any uploaded into EHRS Multimedia viewer) to assess the contributory risk factors for wound non-healing.  (Id.)

40.   Dr. Mehta set up another wound care routine for Windham on January 12, 2018, which included "wound dressing orders for both lower legs and left upper thigh and any other new lower extremity wounds: Daily and prn dressing soakage/soiling/dislodgement and removal of prior dressings using sterile saline to prevent skin trauma and peeling, and to document the status of prior dressing and wound examinations in Windham's chart.  Do not apply on intact skin, cover with Telfa and secure with loosely wrapped Kerlix and Surginet.  Please do not use adhesive dressings due to patient's fragile skin.  Inform MD if worsening drainage/purulence/odor/peri-wound erythema/deep tracking.  Educate patient about limb elevation to augment wound healing."  (DX B, p. 76.)

///

///

8

41. On January 13, 2018, Nurse Friend sent a note to Dr. Pai indicating that although Windham's wounds appeared to be smaller with no inflammation or discharge, he was refusing to comply with any of the recommendations by Dr. Mehta. (DX B, p. 75.) She also noted that Windham wanted to be seen by his doctor at UCSF for skin grafts, but would go to Dr. Freeman in Bakersfield, whom Windham had seen before. (Id.)

42. On January 23, 2018, Dr. Dhillon became Windham's primary care physician (PCP), and continued Windham on the same treatment plan. (DX B, p. 77-78.)

43. On March 26, 2018, Dr. Ditomas spoke with the plastic surgeon's department at Highland Hospital for clarification of the wound care orders. (DX B, p. 86-87.) Dr. Ditomas noted that the "duoderm is causing significant pain with removal and appears to be causing some damage to underlying skin. Discussed the case with NP Doug Beazley in Dr. Allan's office, but he was not able to find a dictated note from the visit on 3/19/18. NP Beazley did not see the pt himself but recalls the patients and did discuss the plan with Dr. Allan. He states that Dr. Beazley did not feel that this patient needed to be seen by a plastic surgeon and saw no indication for skin grafts, but recommended aggressive wound care." (DX B, p. 86.)

44. On April 23, 2018, Dr. Rading noted that Windham had a developed a fever the previous week and was sent to Highland Hospital for treatment. (DX B, p. 88.) Dr. Rading's note indicated, "Patient was housed in outpatient housing unit and was getting dressing changes on his wounds until last week when he developed fever and had to go out to the hospital. (DX B, p. He was admitted to San Joaquin General Hospital on April 9 and discharged on April 11. Pt was treated for cellulitis with keflex and doxy for 10 days. His wound cultures came back positive for MRSA which was sensitive to doxycycline." Dr. Rading discussed the MRSA diagnosis with infectious disease specialist, Dr. Bick, who indicated that Windham's wounds would always have some growth, and the doxycycline should be fine as long as patient doesn't have any more fever or worsening cellulitis." Dr. Rading also noted that Windham went to Highland Hospital for wound follow-up on April 16, 2018. Nothing in the records indicates that Windham's MRSA infection was caused by water dripping into his wounds from the ceiling of his cell. (DX B, p. 87-94.)

45. By October 2018, Windham refused to see CDCR's doctors for wound care, and would only see plastic surgeons and follow the directions of plastic surgeons. (DX B, p. 88-90*.)

46. On October 5, 2018, Windham was seen in the Outpatient Hospital Unit (OHU) by Dr. Rading who made extensive notes regarding Windham's recent treatment. Specifically, Dr. Randing noted, "Mr. Windheim is a 67-year-old African-American male with a history of burns in 1992 who has had multiple skin grafts at UCSF in the past but have failed. He had been seen at UCSF plastic surgeon who did multiple skin grafts which never healed the last time he saw the patient which was September 2017 he recommended aggressive wound care. Patient was also seen by a plastic surgeon at Mercy Hospital in Bakersfield who also recommended aggressive wound care but no surgery. Again he was seen

by another plastic surgeon at Highland Hospital was recommendation was that all he needs is aggressive wound care. He has filed multiple appeals stating that he needs to go back to UCSF to be seen for grafts. We have tried to explain to him multiple times that he is not a surgical candidate at this time we need to do aggressive wound care and follow-up with the wound clinic and if it will re-check time that he needs to have surgery then he may be referred but at this time what is needed is aggressive wound care. Patient has adamantly refused all the recommendations that we've given him so far. He also refused to see the wound care specialists despite multiple attempts. Essentially he has been requesting to be transferred out of this institution to an institution that would send him to UCSF where he believes he will get a skin graft. (Id.)

It has also been reported that usually after he takes a shower, there is blood all over the shower including the shower head, the shower chair, the rails and even high up on the walls and it's not clear how blood from his legs get up that high up on the wall. The nurses also report in their documentation that there is always clotted blood on the outside of the kerlix that is usually used to cover his wounds on top of the Xeroform and Tegaderm. It is unclear how the blood gets from under the Xeroform, through the Tegaderm onto the outside of the Kerlix. When this was discussed during our interdisciplinary meeting the nurse was asked to observe him during shower to see how he ends up bleeding that much and may be provide him education on how to keep his wounds intact so that he does not bleed a lot. Unfortunately, Mr. Windham got upset when the nurse went to observe him so he physically assaulted the nurse. He is now in administrative segregation for that assault. (DX B, p. 89.) This morning he was scheduled to see me for his monthly visit and when the nurse and the CNA went to ask him to take vitals he stated he wanted to see me later after coming from the library. I told the nurse to inform him that I'd like to see him in the morning and possibly open his wounds before he takes a shower so we can see how they look before they get wet. He finally came in to see me with the officer and when I said good morning to him he did not respond. I greeted him again louder but he still do he did not respond instead he was shuffling some papers. I then asked him if he is going to talk to me and he told me that he cannot see me anymore because he has filed a lawsuit against me." (DX B, p. 89.)

47. Windham transferred from CMF on October 18, 2018. (DX A, p. 1.)

48. Beginning in April 2018, Nurses Champion and Innes-Burton began to notice that Windham was showering with his dressings still on, and that there were several instances where the dressings seemed to have been manipulation after the previous dressing change. (DX B, pp. 96-182.)

49. On April 12, 2018, Nurse Innis-Burton noted, "before the shower, all dressing were dry and free of any drainage. I/P even pulled dressing down from Rt lower outer leg to show the doctor that he had a Petroleum Gauze over Silver Sulfadene under the Keflix gauze wrap. After the shower all dressings had bloody dripping. When asked why the dressings were so bloody the I/P replied that "the dressings are all wet and any blood under them just drips.

///

10

The wound grafts sites are located: Rt outer mid calf; Lt inner calf (under the knee); and Lt upper thigh (close to the groin and below the buttocks).

Because of the late hour for the dressing change no measurements were made, but MD asked to measure and take pictures tomorrow for the dressing change. All dressings were removed and MD able to examine prior to cleaning and redressing. Cleansed with normal saline soaked gauze with noticeable squirming discomfort from the I/P. There was black skin that was rolling off under the saline gauze as the Rt outer calf and Lt inner calf areas were clean. Noticeable darker discoloration and swelling around the Rt ankle under the Rt mid calf wound graft site. All areas were patted dry and then Silver Sulfadene applied, then since no Petroleum Gauze that was large enough to cover wound graft sites, Xeroform was used instead, then Telfa Non-Adherent dressing, then wrapped with Kerlix Gauze, then secure shut with paper tape. MD stated that she ordered Xeroform Gauze for dressing changes." (DX B, p. 98-99.)

50. On April 14, 2018, Nurse Innis-Burton did Windham's dressing change, and noted that "The Rt Outer calf area continues to have some vertical lines above the main wound opening as though the area is being scratched." (DX B, p. 100.) She also noted, "The Rt outer foot also had Silver Sulfadene that was at the ankle area as though the dressing had been pushed down then pulled back. Please note that there was dried blood on the top of I/P's index and middle finger on the right hand." (DX B, p. 100.)

51. Nurse Champion noted on April 22, 2018, that "The surrounding skin is darker and very thin. There are many superficial breaks in the thin skin around the main wound. The breaks in the skin are short and linear (scratching?). The wounds on the left posterior thigh continue to close slowly. There are only three and all three are nearly closed with granulation tissue. No short and linear breaks in the skin are seen here." (DX B, p. 105-106.)

52. On April 27, 2018, Nurse Innis-Burton noted that Windham's dressing appeared intact underneath and "did seem as though it was disturbed with blood clots at various places and bleeding mixed with Silver Sufadene." (DX B, p. 107.)

53. On May 13, 2018, Nurse Champion noted, "When finished with shower, I/P dried himself off then dressed himself. The nurse prepared dressing supplies while I/P waited in shower room. When Nurse approached shower room, he heard running water from the bath tub in the shower room. Patient was observed getting back into his wheelchair from the side of the tub. When patient exited the shower room, his dressings were dripping wet and as he wheeled himself down the hallway towards the treatment room he left a bloody water trail to the treatment room and inside the room. Though I did not see Mr. Windham place his right leg under the stream of water coming from the tub spout, I suspect that is what he did judging from the amount of bloody water he left behind on his way to the treatment room. There was a large amount of standing water next to the tub." (DX B, p. 114.)

///

11

54. On May 15, 2018, Nurse Champion noted that "First thing noted on this round of dressing changes is the position of the Xeroform dressing, it had been pushed up along the surface of Mr. Windham's right lower leg. The skin was especially bloody at this spot. (DX B, p. 115.)

55. Nurse Innis-Burton noted on June 2, 2018, "The old dressings on the Rt leg looked as though Kerlix was untouched but the Telfa and Xeroform under the Kerlix was twisted and up from the bottom. Pointed this out to I/P who stated 'Now tell me how the top can be in the same place and underneath dressing moved . . . tell me Ms. Burton.'" (DX B, p. 124.)

56. Nurse Innis-Burton noted on June 6, 2018, "The old dressings were different than the usual Kerlix, Xeroform, & Kelfa. There was a non-adherent dressing, covered by ABD pads, then a stretchy gauze like bandage. When I asked I/P who did the dressing he responded 'I did.' Asked how it was cleaned, I/P responded 'Don't worry about that I have something . . . . I have some supplies from when I was at Corcoran.' There were the usual clots and bloody drainage on bilateral lower extremity wound sites." (DX B, p. 127.)

57. On June 16, 2018, Nurse Innis-Burton noted that the dressing had been manipulated since she had changed it the previous day, stating, "The Rt outer mid calf and Lt inner calf dressings both had small blood specks on the outside of the Kerlix as though it had been rewrapped (different pattern from when I wrapped it yesterday)." (DX B, p. 132.)

58. After Windham had showered on July 11, 2018, the certified nursing assistant (CAN) notified Nurse Champion that the shower was a "bloody mess." (DX B, p. 148.) Nurse Champion went to the shower Windham had used and found, "Ribbons of clotted blood are deposited on the hand rail, bench, floor and walls around the shower head and handle. More clotted blood was smeared on the handrails, the shower handle, the bench in the shower, walls and floor." (Id.)

59. On June 18, 2018, Windham filed a grievance noting that the conditions in his cell were unsanitary. (DX A, p. 4-5.) Specifically, Windham complained of peeling paint on the walls, and a hole in the ceiling that leaked water when it rained. (Id.) There was no mention that water was leaking onto his bed or saturating his dressings. (Id.)

60. Associate Warden Medina authored the response noting that workers had thoroughly cleaned Windham's cell on July 9, 2018, and a work order was submitted to plant operations to fix the ceiling in his cell if necessary. No further modifications were required. (DX A, p. 6.)

61. Although Windham tried to associate the infection he suffered in April with the conditions of his cell, nothing in the doctor's report indicates that Windham's infection was caused by the conditions of his confinement. (DX A, p. 7-10.)

///

///

12

62. On July 10, 2018, Windham filed a grievance claiming that he was being denied hydrotherapy and the reasonable accommodation of bathing instead of showers. (DX A, p. 11-12.) Plaintiff wanted to be transferred to another institution, or transfer to a facility that had appropriate bathing facilities. (DX A, p. 12.)

63. Associate Warden Wofford answered on behalf of the reasonable accommodation panel, finding no reason to transfer Windham, who was already in the Outpatient Housing Unit (OHU) and receiving aggressive wound care. (DX A, p. 14.)

64. On November 18, 2017, Dr. Sawicki in the Podiatry Clinic recommended the possibility of hydrotherapy for Windham, but Windham was told to follow up with his primary care physicians and outside specialists, none of whom recommended hydrotherapy. (DX B, p. 55-56.)

65. Chief Medical Officer Austin and Chief Gates of the Healthcare Appeals Branch also determined that hydrotherapy was not necessary. (DX A, p. 15-20.) Warden Wofford who signed the response to Plaintiff's grievance is also known as Warden Snelling as indicated in Plaintiff's complaint.

66. The Chief Medical Officer, who reviewed Windham's entire medical file, found that CDCR had the ability to help Windham have a better wound care outcome, but Windham's continued refusal to follow his wound care plan, or to interact with his treating physicians or the wound care specialist, contributed to his poor outcome. Hydrotherapy had not been recommended by Windham's physicians. (DX A, p. 17-18.)

ECF No. 38-3.

  **B.**  **Plaintiff's Evidence**

In response to Defendants' Statement of Undisputed Facts, Plaintiff offers his own Statement of Disputed Facts asserting genuine issues of disputed fact, ECF No. 41 at 4, as well as the following exhibits:

| | | |
|---|---|---|
| | Exhibit A | Plaintiff's second amended complaint, id. at 17. |
| | Exhibit B | Plaintiff's medical records, id. at 36. |
| | Exhibit C | Plaintiff's medical records, id. at 71. |
| | Exhibit D | Plaintiff's medical records and prison grievances, id. at 83. |
| | Exhibit E | Plaintiff's medical records and chrono classification, id. at 123. |
| | Exhibit F | Plaintiff's medical records and deposition testimony, id. at 235. |

///

///

Because Plaintiff is pro se, the Court "must consider as evidence in his opposition to summary judgment all of [the] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [Plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004). Therefore, the Court will also consider as evidence the factual assertions made in Plaintiff's complaint, which is verified.

### III.  STANDARD FOR SUMMARY JUDGEMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the

dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251.

///
///
///
///

## IV.  DISUCSSION

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. Cnty. of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

/ / /

/ / /

/ / /

1          The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint, 801 F.2d at 1111. Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

### A.     **Defendant Woffard**

Plaintiff alleges that Defendant Woffard denied him access to a hydrotherapy bathtub that Dr. Sawicki prescribed for him. ECF No. 23 at 8. However, Plaintiff's medical records show that neither Dr. Sawicki, nor any other physician, actually prescribed a hydrotherapy bathtub. In fact, Dr. Sawicki merely noted it as a possible course of treatment and that a vascular specialist should be consulted on the usage of such treatment. ECF No. 38-3 at 94-95. Plaintiff's claim, at best, describes a difference of medical judgment, which is insufficient to support his claim. See Franklin v. State of Or., State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981) ("A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim.").

///
///
///

Plaintiff also alleges that Defendant Woffard denied him access to a plastic surgeon. ECF No. 23 at 8. Yet, the record shows Plaintiff had several opportunities to see a plastic surgeon. ECF No. 38-3 at 34, 93, 110. Plaintiff, however, refused to be seen when he learned the plastic surgeon was not Dr. Hansen.[1] As Plaintiff does not have a right to choose a specific doctor, see Ramirez v. Nazareno, No. 1:16-CV-01772-DAD-EPG, 2016 WL 7384013, at *3 (E.D. Cal. Dec. 20, 2016) (noting there is no constitutional right to choose a specific doctor), and there is no evidence that Defendant Woffard prohibited Plaintiff from seeing a plastic surgeon, this claim fails.

### B. Defendants Pai and Osman

Plaintiff claims Defendants Pai and Osman failed to provide him with adequate medical care. ECF No. 23 at 12. Specifically, he claims they did not comply with treatment orders from a specialist at UCSF. ECF No. 28 at 12. However, a review of Plaintiff's medical records shows that, while he was at CMF, doctors repeatedly and consistently prescribed him wound care. See ECF No 38-3 at 74, 78, 86, 91, 99, 101, 107, 112, 120. His records also demonstrate that both Defendants Pai and Osman ordered and provided him wound care. There is no evidence demonstrating that Defendants Pai or Osman acted with deliberate indifference to Plaintiff's serious medical needs.

Plaintiff additionally asserts that Defendants Pai and Osman denied him access to a specific plastic surgeon. As noted above, Plaintiff does not have a right to choose a specific doctor. See Ramirez, 2016 WL 7384013, at *3. To the extent Plaintiff argues he was not provided with surgical intervention, his medical records indicate that at least three plastic surgeons recommended against surgical intervention and instead recommended wound care. Id. at 130.

///
///

---

[1] Throughout Plaintiff's pleadings, it is apparent that he preferred Dr. Hansen to other plastic surgeons. At some point, Dr. Hansen's contract with the California Department of Corrections and Rehabilitation ended and Plaintiff was informed that if he wanted to see Dr. Hansen, he would have to pay for the visit himself. ECF No. 38-3 at 93.

Plaintiff also claims that Defendant Pai referred him to a specialist that worsened his injuries. ECF No. 28 at 12. Nothing in the record suggests that Defendant Pai referred Plaintiff to any specialist with the knowledge that the specialist would cause him harm. Thus, Plaintiff cannot establish Defendant Pai's deliberate indifference in this regard.

### C. Defendants Champion and Inniss-Burton

Plaintiff claims Defendants Champion and Inniss-Burton used a type of adhesive bandage (DuoDERM) that damaged his wounds and failed to comply with treatment orders from a specialist. Id. However, Dr. Faiza Rading, a doctor treating Plaintiff, ordered DuoDERM for Plaintiff.[2] ECF No. 41 at 187. Defendants Champion and Inniss-Burton merely complied with the doctor's orders when they used that product. See Gould v. California Dep't of Corr. & Rehab., No. 2:18-CV-1981-JAM-EFB (P), 2020 WL 704000, at *3 (E.D. Cal. Feb. 12, 2020) (concluding that it is not possible for a nurse to have a culpable state of mind constituting deliberate indifference when all she did was follow doctor's orders). Moreover, there is no evidence that the doctor's order was so obviously incorrect that Defendants Champion and Inniss-Burton exhibited deliberate indifference merely by complying with it. Plaintiff's additional claim that Defendants Champion and Inniss-Burton failed to comply with treatment orders from a specialist is also unsupported by the record. Plaintiff's concurrent claim that Defendant Champion falsified his medical records also lacks support in the record.

### D. Defendant Medina

Plaintiff alleges that Defendant Medina kept him in an unsafe cell that leaked contaminated fluid into his wounds, causing a MRSA infection. ECF No. 28 at 10. Generally, "extreme deprivations are required to make out a conditions-of-confinement claim," and "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S.1, 9 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

---

[2] Plaintiff's medical record indicates that shortly after DuoDERM was proscribed, a decision was made by Michele Ditomas to stop using DuoDERM because it caused Plaintiff pain when it was removed. ECF No. 41 at 191.

While there is no dispute that the ceiling leaked in his cell, this claim fails for two reasons.  First, Defendant Medina promptly responded to the issue four days after Plaintiff complained about the leak when Defendant Medina had Plaintiff's room thoroughly cleaned and submitted a work order to have the leak repaired.  ECF No. 38-3 at 22.  This prompt action on Defendant Medina's part does not indicate deliberate indifference to Plaintiff's living conditions, medical needs, or safety.  Second, there is no evidence that the leak caused his infection.  In fact, Plaintiff's infection occurred three months before he submitted a grievance complaining about the leak.

## V.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Defendant's motion for summary judgment, ECF No. 38, be granted; and
2. All other pending motions, ECF Nos. 39 and 46, be denied as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to the objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 13, 2021

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE